# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| SHERYL R. MANKLE, <br><br> Plaintiff, <br><br> vs. <br><br> JO ANNE B. BARNHART, <br> Commissioner of Social Security, <br><br> Defendant. | No. C05-4072-PAZ <br><br> **MEMORANDUM OPINION AND ORDER** |

## I.  INTRODUCTION

The plaintiff Sheryl R. Mankle ("Mankle") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Mankle claims the ALJ erred in failing to credit the opinion of her treating physician, and in finding she retains the residual functional capacity to work. (*See* Doc. No. 11)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  *Procedural Background*

On February 18, 2003, Mankle filed an application for DI benefits, alleging a disability onset date of September 8, 2002. Mankle claims she is disabled due to mitral valve repair, femoral artery transplant, thrombotic thrombocytopenic purpura, and strokes. She claims these conditions prevent her from lifting over thirty pounds, remaining on her feet for more than six hours daily, or working in temperatures above eighty degrees or below thirty-two degrees. (R. 54) Mankle's application was denied initially and on reconsideration.

Mankle requested a hearing, and a hearing was held before ALJ Robert Maxwell on April 20, 2004.[1] Mankle was represented at the hearing by attorney David A. Scott. Mankle testified at the hearing, and Vocational Expert ("VE") William Tucker also testified.

On September 10, 2004, the ALJ ruled Mankle was not entitled to benefits. Mankle appealed the ALJ's ruling, and on May 25, 2005, the Appeals Council denied Mankle's request for review, making the ALJ's decision the final decision of the Commissioner.

Mankle filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On December 12, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. Mankle filed a brief supporting her claim on January 6, 2006. The Commissioner filed a responsive brief on January 31, 2006. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Mankle's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Mankle's hearing testimony

At the time of the hearing, Mankle was fifty-five years old. She lives in Spencer, Iowa, with her husband. Mankle graduated from high school and then obtained a two-year degree from a community college. She last worked from May through September 2003, selling tickets at an amusement park for about twenty hours per week, a job she also did in 2001 and 2002. For the first two years, she worked between twenty-five and thirty hours per week, but in 2003, she asked that her hours be reduced. She has a good attendance record on the job and did not miss any days of work due to physical symptoms. She plans to continue doing the seasonal ticket sales job in the future.

---

[1] Although the transcript and the index in the administrative record both indicate the hearing was in 2005, this obviously is in error given the dates of the ALJ's decision and the Appeals Council's ruling.

From 1998 to 2000, Mankle worked at Wal-Mart as the concession stand supervisor. In December 1999, she had a stroke that paralyzed her right hand and the right side of her face for a period of time. Medical testing revealed a problem with her mitral valve. She underwent surgery to repair her mitral valve on February 17, 2000, in Mason City, Iowa. She returned to work full time at Wal-Mart six weeks after surgery, but she was unable to lift, her pace was very slow, she had to stop and rest frequently due to pain in her right foot, and her ankles would be quite swollen by the end of the day. Doctors discovered she had a blockage in the artery in her right leg. Mankle underwent a femoral artery bypass to repair the artery in her right leg.

Mankle returned to work at Wal-Mart only for the purpose of training another worker to take over the supervisory position. Mankle did not believe she could work full time any longer. She stated her ankles would swell if she was on her feet for too long, she could not lift over thirty pounds, and she was fatigued constantly. She stated her employer was very supportive of her and was happy with her work, but she resigned because she no longer felt able to do the job.

Mankle stated she takes morphine and aspirin for pain, and she has a blood test once per month and a complete physical annually. In April 2004, doctors found a lump on the bone of her right leg. According to Mankle, blood had seeped into the fatty tissue surrounding the bone creating a sac of blood. She stated the blood eventually drained down into her ankle and "messed [her] ankle up completely." Mankle opined she could stand for six hours in an eight-hour day, if she stands on her left leg. She indicated she has no difficulty sitting.

Mankle claims she has some memory problems as the result of several mini-strokes. She sometimes has to have things explained to her more than once, and sometimes cannot think of the right word to say. She also has a partial closure of the artery to her kidney, and she experiences backaches frequently due to this problem. Mankle also indicated she

suffers from rheumatoid arthritis, but she is not claiming this condition prevents her from working.  She stated she is unable to work because of poor circulation that causes her to "be very slow and fatigued."  She stated if she is able to stop and rest periodically, then she can keep going, but she has to be able to stop and rest as needed.  She becomes short of breath if she climbs stairs or hills or walks too fast, and she also has difficulty breathing if the weather is humid, cold, or over eighty degrees.  She indicated she is able to work at the amusement park ticket booth because it is air conditioned and she can sit down.  Mankle stated if she gets too hot or too cold, and her blood pressure gets too high, she coughs up blood.  Mankle stated she smokes about a pack of cigarettes a day during the winter, and about half a pack daily during the summer.  She acknowledged that doctors have indicated some of her breathing problems could be due to her smoking.

Mankle passes her time at home doing housework, gardening, and needlepoint.  She regained the feeling in her right hand after her stroke, but she stated she still has some difficult with grasping.  Mankle indicated she chose September 8, 2002, as her disability onset date because after the amusement park closed, she was exhausted.  She obtained unemployment benefits through the end of 2002, and acknowledged she had to represent to the State of Iowa that she was ready, willing, and physically able to work to obtain those benefits.  Her other past work has included being a motel desk clerk.

Mankle complained of residual problems from her mitral valve repair.  According to her, a doctor told her "the valve is closing too fast which is constantly why it's not . . . getting all the blood out of [her] lungs like it [is] supposed to."  However, she had not seen the cardiologist since October 2000, and the only restriction her doctors have imposed upon her is not to lift over thirty pounds.  She has a staple in her chest from the surgery that causes her some pain if she twists the wrong way.

## 2. Mankle's medical history

On January 12, 2000, Mankle was evaluated by S. Congello, D.O. for a transient ischemic attack ("TIA"). Mankle described an incident where she experienced about thirty minutes of numbness in her right hand and the right side of her face, right hand clumsiness, and difficulty speaking. Her symptoms spontaneously resolved. Her family doctor ordered a CT scan that showed small evidence of TIAs. The reason for Dr. Congello's evaluation was Mankle's complaint of recent episodes of chest discomfort, palpitations, occasional light-headedness, shortness of breath, and increasing tiredness, fatigue, and dyspnea on exertion for several months. An electrocardiogram showed "normal systolic function but mildly dilated left ventricular volumes, bicuspid aortic valve, severe mitral regurgitation, mild tricuspid regurgitation, and mild aortic insufficiency." Dr. Congello opined Mankle's fatigue, chest discomfort, shortness of breath, and other symptoms could be due to her severe mitral regurgitation. The doctor recommended Mankle undergo right and left heart catheterization with aortogram to determine whether she was a candidate for valve replacement. The doctor noted Mankle's chest pain also could be angina related to her smoking, and further noted Mankle was mildly hypertensive. In addition, the doctor opined Mankle had had a TIA episode.

The same date, Mankle was seen by Daniel J. Waters, D.O. for surgical consultation with regard to Mankle's mitral valve disease. Dr. Waters recommended surgery to repair Mankle's mitral valve. He noted Mankle had a long-standing history of thrombocytopenic thrombotic purpura ("TTP") that could complicate matters but was considered to be manageable. He recommended Mankle consult with a hematologist prior to surgery due to the possibility of bleeding and potential hematologic complications from surgery. Mankle saw W. Bate, M.D. for the hematologic consultation on February 1, 2000. Dr. Bate noted several concerns about possible complications to Mankle's TTP from the surgery.

On February 16, 2000, Mankle underwent a pulmonary function test that showed mild to moderate obstruction. Mankle underwent surgery on February 17, 2000, to repair her mitral valve. The surgery was successful and Mankle tolerated the procedure well. She was discharged on February 21, 2000, with instructions to follow a low salt, low fat, and low cholesterol diet. At follow-up visits on March 14, 2000, and April 13, 2000, Mankle reported doing well since her surgery, with improvement in her cardiac symptoms, and good appetite and activity levels. At the April appointment, she stated she was anxious to return to work.

In late September 2000, Mankle saw a doctor with a complaint that since her catheterization, she was limited to walking only a few blocks at a time. She was admitted to the hospital for testing, and an angiogram showed complete occlusion of the right superficial femoral artery. Testing also indicated Mankle had "[r]enal vascular disease with probable significant stenosis of the right renal artery and mild plaque on the left[, with . . .] no significant hypertension and [good] renal function." On September 28, 2000, Mankle underwent right femoral to popliteal bypass. She was discharged on September 29, 2000, with prescriptions for Coumadin and Percocet.

In December 2000, lab testing indicated Mankle had elevated cholesterol and triglyceride levels. She was encouraged to eat a low-cholesterol diet. Mankle had a complete physical a year later, in December 2001, and reported she was had been feeling good. She denied any headaches, blurred vision, double vision, hearing problems, shortness of breath or cough, dyspnea with exertion, chronic cough or lung congestion, chest heaviness, syncopal episodes, light-headed dizziness, swelling of the feet, and anginal symptoms. She stated she could walk as far as she wanted to without any discomfort, and she denied any circulation troubles or coldness of her feet and hands. She reported her heart disease and mitral valve problems were all resolved. She continued to smoke about a pack a day, and again was cautioned to stop smoking. Her heart rate was

noted to be regular with no murmurs and normal heart sounds. Her EKG showed normal sinus rhythm overall. She was noted to have no psychiatric or mental health issues and "[n]o evidence of memory loss." Lab tests of her kidneys, liver, and thyroid all were normal. Her cholesterol was high but her triglycerides were down, and she was advised to continue compliance with her diet. She discussed trying Zyban to help her quit smoking.

In May 2002, Mankle was started on an ACE inhibitor and a diuretic to control her blood pressure and fluid retention. Mankle was seen for an annual physical examination in December 2002. She again was encouraged to quit smoking in light of her heart, lung, and vascular problems, but notes indicate Mankle was unwilling or unable to do so. At this examination, Mankle reported her "problems with TIA's and strokes in the past . . . [had] affected her mental status and mentation." Mankle described problems with concentrating, staying on task, and focusing, and she stated the only job she had been able to do was working as ticket-taker at the amusement park. However, examination revealed Mankle to have normal mentation, and no evidence of memory loss.

Mankle also stated she was limiting her activities, and reported she could not do extensive walking or go out in cold weather. As a result, the doctor ordered a vascular Doppler ultrasound. The test showed normal ankle brachial indices with normal segmental pressures in both legs. An echocardiogram to reevaluate the status of Mankle's arteriosclerotic heart disease indicated she continued to have an abnormal mitral valve with the possibility of some rheumatic deformity. An EKG showed normal sinus rhythm overall, and a chest x-ray was normal.

On March 31, 2003, Lawrence F. Staples, M.D. reviewed the record and completed a Residual Functional Capacity Assessment form concerning Mankle. Dr. Staples noted that on March 31, 2003, Mankle indicated she had not seen a physician for any reason since her annual physical exam in December 2002. He noted Mankle claimed she was

nauseous most of the day, but she had not reported this nausea to her doctor at her annual physical in December 2002, and in fact, she denied nausea, vomiting, diarrhea, or constipation at that time. Dr. Staples found these inconsistencies eroded Mankle's credibility. He opined she should be able to lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour day; and push/pull without limitation. He opined she could balance frequently, and perform all other postural activities occasionally, and she would have no other job-related limitations. Jan Hunter, D.O. reviewed the record on May 27, 2003, and concurred in Dr. Staples's assessment.

Mankle had an annual physical examination in December 2003. She continued to smoke despite ongoing counseling that she should stop. She denied cardiovascular symptoms, and her heart sounds were normal. She showed no evidence of memory loss. The doctor emphasized to Mankle that she should quit smoking or she would be at risk for another stroke, heart attack, or other vascular problems. Notes indicate Mankle was "just not willing to quit."

On March 24, 2004, Dr. Robison met with Mankle's attorney to discuss Mankle's application for disability benefits. Dr. Robison dictated a letter as a follow-up to that conversation in which the doctor opined Mankle "meets criteria for disability based on her cardiac status." He noted Mankle "suffers from severe peripheral vascular disorder"; she "had a stroke in 1979 that has left her with some residual memory problems and residual nonspecific weakness"; and she is at risk for continued progression of her heart disease and vascular disorder because she continues to smoke. Dr. Robison stated Mankle does not get adequate medical care due to lack of funds. He specifically stated she needs an angioplasty for her renal artery stenosis and she has been unable to have the treatment due to lack of funds.

The Appeals Council had the benefit of additional medical records that were submitted following issuance of the ALJ's opinion. These records included evidence of a hospital admission on July 31, 2004, when an ambulance was called to Mankle's residence due to her report of a "severe headache," and her statement, "I think I have an aneurysm." She complained of a headache in the back of her head, radiating down into her neck. Objective observations showed Mankle had slowed and slurred speech, somewhat weakened right-sided grip, and some weakness of her right lower extremity. She complained of difficulty focusing her eyes and was noted to be slow answering questions. Mankle was taken to the hospital, where a CT scan revealed a "[m]oderate to marked subarachnoid hemorrhage without evidence of significant parenchymal edema."

Mankle was transferred to the Mayo Clinic in Rochester, Minnesota, for further evaluation and treatment. An emergent angiogram revealed a basilar tip aneurysm that was treated with a coil placement. A lumbar drain was in place from July 31 to August 8, 2004. Upon her admission to the clinic, Mankle also was felt to have aspirated, and she was having respiratory difficulties. She was treated with antibiotics for ten days. While in the hospital, Mankle underwent occupational therapy to assist her in gaining functional independence. She was directed to sit while bathing "for safety due to decreased standing balance." She was noted to have some double vision due to cranial nerve palsy, and she initially was provided with glasses to assist her with this until her double vision subsided. Notes indicate the therapist thought Mankle might "benefit from returning to work once increased endurance is demonstrated and patient is able to tolerate work responsibilities." Mankle was discharged from the hospital on August 16, 2004, with prescriptions for Percocet for pain, Colace while on Percocet, Senna while on Percocet, and Nimodipine until August 30, 2004. Mankle was on Coumadin and Aspirin upon admission, and both of these medications were discontinued by the Mayo Clinic doctors.

### 3. *Vocational expert's testimony*

The ALJ asked VE William B. Tucker to consider a fifty-five-year-old individual with an Associate's degree and Mankle's work history. If the individual had the work-related limitations described by Mankle, then the VE opined she would be unable to work in a full-time, competitive employment situation.

The ALJ then asked the VE to consider an individual of the same age and with the same educational and work history as Mankle, who has the following limitations: lift or carry up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit, with normal breaks, for six hours in an eight-hour day; push or pull without limitation; and perform all postural activities occasionally, except balancing could be done frequently. The VE stated this hypothetical individual would be able to perform all of Mankle's past jobs as they are performed in the national economy. However, as the food concession supervisor was described by Mankle, the job would be medium level and would be excluded. The VE stated the individual would be able to perform the full range of unskilled, light jobs.

### 4. *The ALJ's decision*

The ALJ found Mankle has severe impairments consisting of "a medically determinable cardiac impairment (i.e., atherosclerotic heart disease, status post mitral valve replacement on February 17, 2000) and a medically determinable peripheral vascular impairment (i.e., she is status post aortal femoral artery bypass surgery on September 28, 2000)." However, he found these impairments, singly or in combination do not meet Listing requirements.

The ALJ noted that although Mankle alleges she has been disabled since September 8, 2002, she returned to her seasonal job in May 2003, and engaged in

substantial gainful activity until September 2, 2003. He therefore found "the first date wherein disability can possibly be established in this case is September 2, 2003."

The ALJ found that if Mankle's "testimony regarding the alleged severity of her fatigue and her need to take frequent rest breaks throughout any given day were found to be entirely credible," then she would be found disabled from September 8, 2002. However, he found Mankle's testimony not to be fully credible. He noted Mankle's seasonal job at the amusement park ended when the park closed, not because of Mankle's medical condition. He noted Mankle underwent annual physical examinations by Dr. Robison, who noted, in December 2003, that Mankle's laboratory reports looked surprisingly good.

The ALJ did not give significant weight to Dr. Robison's opinion that Mankle is disabled. He noted that in the doctor's opinion letter, he stated Mankle had "extreme dyspnea due to poor circulation of her heart." However, when Dr. Robison evaluated Mankle in December 2003, his notes indicate she denied having shortness of breath, dyspnea with exertion, or other similar symptoms. The ALJ noted that although Dr. Robison indicated, in his letter, that Mankle had residual memory problems stemming from her 1979 stroke, the doctor's reports from Mankle's annual physical examinations indicated she displayed no evidence of memory loss. The ALJ found these inconsistencies between the medical evidence and Dr. Robison's opinion letter warranted giving the doctor's opinion little weight.

The ALJ found it significant that the most money Mankle ever earned during the past fifteen years "was $13,181.13 which she earned in 2000, the year in which she underwent her two surgical procedures." The ALJ noted Mankle failed to comply with her doctor's repeated advice that she stop smoking. He further noted Mankle has reported that she babysits her grandson two days per week, and she regularly performs household chores, including cleaning, laundry, dishes, home repairs, washing the car, and gardening.

The ALJ adopted the residual functional capacity findings of the State agency consultants, and concluded Mankle retains the RFC to perform a wide range of light exertional work activity. He further found Mankle retains the RFC to return to her past work as a concession cleaner, concession supervisor, and ticket seller. The ALJ therefore stopped his analysis at step four of the sequential evaluation, and found Mankle not to be disabled.

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. *Disability Determinations and the Burden of Proof*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her

physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though

the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### *B. The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is

substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations

are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Mankle argues the ALJ erred in discounting Dr. Robison's opinion that she is disabled. She argues the ALJ did so based on one apparent inconsistency regarding whether she experienced exertional dyspnea. She asserts her consistent diagnosis of severe atherosclerotic heart disease supports her testimony that she experiences shortness of breath upon exertion, particularly when she is climbing stairs or hills, walking fast, or is exposed to humid or cold conditions.

Mankle further argues Dr. Robison's indication that she was "at great risk for continued progression of her disease" was borne out by her subarachnoid hemorrhage that occurred 102 days after the ALJ hearing. She argues the ALJ erred in relying on the State agency consulting assessment of her RFC because that assessment "was based upon what [Mankle] thought she was capable of doing for 25 to 30 hours per week, four months out of the year, in 2001 and 2002, and not the reduced hours of her work schedule beginning in the summer of 2003." In sum, Mankle argues "a preponderance of the evidence" compelled a finding by the ALJ that she has been disabled since September 8, 2002.

The Commissioner argues the ALJ gave appropriate weight to Dr. Robison's opinion, which was "entirely inconsistent with both [Mankle's] reported symptoms and his examination findings." The Commissioner notes Mankle told the doctor she could "walk as far as she wants without any discomfort" in December 2001, and she denied cardiovascular symptoms in each of her annual physical examinations. Mankle also denied memory problems at her annual physical exams, and objective examination of her musculoskeletal system each year revealed full ranges of motion, equal muscle groups bilaterally, and no neurological deficits. The Commissioner therefore argues that contrary to Mankle's claim, the inconsistencies between Dr. Robison's opinion letter and his objective findings over the course of his treatment of Mankle go far beyond the issue of whether Mankle becomes short of breath upon exertion.

The Commissioner further notes Mankle failed to stop smoking as directed by her doctor. She also argues the question before the court for review is whether Mankle was disabled at any time through the ALJ's decision on September 10, 2004. The Commissioner asserts Mankle's "hemorrhage was an acute illness, not a condition that she was suffering from during the period covered by the ALJ's decision." She urges Mankle to file a new application for benefits if Mankle believes her condition has deteriorated since the decision in the present case.

The Commissioner further argues the ALJ correctly determined Mankle's RFC, after considering all the evidence of record, and the ALJ also correctly found Mankle's subjective complaints to be less than fully credible.

The court finds the ALJ did not err in rejecting the opinion of Dr. Robison regarding Mankle's disability. During the court's review of Mankle's medical records, the court noted similar inconsistencies between the treatment notes and Dr. Robison's opinion as set forth in his letter. As the Commissioner notes in her brief and the ALJ noted in his decision, Dr. Robison's notes from Mankle's annual physical examinations indicate she denied many of the symptoms the doctor reported in his opinion letter, which was dated only three months following Mankle's most recent physical examination.

Moreover, Mankle, herself, testified she can stand for up to six hours in an eight-hour day, and she has no difficulty sitting for long periods of time. The record fails to substantiate Mankle's claim that she has memory problems that would affect her ability to work, or that her physical limitations are as severe as she claims.

Although the court is troubled by the onset of Mankle's subarachnoid hemorrhage in July 2004, the court, like the Commissioner, notes this event occurred after the period under consideration by the ALJ in this action. The record contains no evidence regarding residual effects from the hemorrhage that would warrant remand for further consideration. The court concurs in the Commissioner's recommendation that if Mankle believes her

condition has worsened since the date of the ALJ's opinion, she should file a new application for benefits.

The court notes Mankle contends the record proves by "a preponderance of the evidence" that she is disabled. The appropriate standard of review is whether the record contains "substantial evidence" to support the Commissioner's decision. The court finds it does. Although in some respects, the court might have weighed the evidence differently, that is not the court's function upon judicial review of a finding that a claimant is not disabled.

## V. CONCLUSION

Accordingly, for the reasons discussed above, the Commissioner's decision is **affirmed**, and judgment will be entered in favor of the Commissioner and against Mankle.

**IT IS SO ORDERED.**

**DATED** this 1st day of June, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT